J-S29001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF R.V.G., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.G., FATHER | | |
| | | No. 272 WDA 2024 |

Appeal from the Order Entered February 1, 2024
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s):  No. 32-23-0246

BEFORE:  DUBOW, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.:                **FILED: March 12, 2025**

Appellant, C.G. ("Father"), appeals from the February 1, 2024 order that terminated his parental rights to now-twelve-year-old R.V.G. ("Child"). Father's counsel, Ashley Lovelace, Esq., has filed a petition to withdraw as counsel and an ***Anders***[1] brief, to which Father has not filed a response.  Upon review, we grant counsel's petition to withdraw and affirm.

The relevant factual and procedural history is as follows.  Father and D.P. ("Mother") are parents to Child, who was born in November 2012. Parents, who lived together but were never married, separated in 2017.  Child lived with Mother, and the parties agreed to a custody order that awarded Father daytime visitation with Child every other weekend.

---

[1] ***Anders v. California***, 386 U.S. 738 (1967).

In 2018, when Child was 6 years old, Mother married D.P. ("Stepfather"). Child lives with Mother, Stepfather, and Child's three sisters. Mother and Stepfather both take care of Child. Stepfather cooks for Child, assists Child with homework, transports Child to extracurricular activities, coaches Child's basketball team, and stays home from work to take care of Child if needed when she is sick.

Father has experienced various difficulties over the past few years, including homelessness, hospitalizations, and incarceration. Father has been inconsistent in visiting with Child. In 2022, Father saw Child approximately 10 times total. From June 2022 until September 2023, Father did not initiate any visits with Child. On September 4, 2023, Father's mother ("Paternal Grandmother") asked to take Child to a family gathering at a park, and Child saw Father there. The last time that Father sent a text message to Mother asking about Child was November 2022. In 2023, Father sent Mother several text messages with links to internet videos. In April and May of 2023, while he was incarcerated, Father sent two letters to Mother with pictures that he drew for Child.

On April 10, 2023, when Child was 10 years old, Mother and Stepfather filed a petition to terminate Father's parental rights to Child. The court appointed Erica Dussault, Esq., to serve as Child's legal counsel. The court held hearings on September 28, 2023, November 30, 2023, and January 29, 2024. The court heard testimony from Mother; Stepfather; Father; and Carolyn Menta, Psy.D., expert in clinical psychology.

Mother and Stepfather testified in accordance with the above-stated facts. In addition, Mother testified that she has observed "some type of bond" between Child and Father but they have "an unstable, inconsistent relationship." N.T. Hearing, 9/28/23, at 23-24. Mother explained that Child "likes the idea of her dad" but that Child often got anxious and sick to her stomach when it was time to visit with Father. *Id.* at 24. Mother also testified that Child is "neutral" towards Father. *Id.* Mother stated that Child is "excited" to be adopted by Stepfather. *Id.* at 28. Mother testified that she has thought a lot about the potential impact of severing the relationship between Child and Father and explained that she believed that adoption was in Child's best interest because "kids need to have consistency and a constant schedule with people that they can count on. That gives them a feeling of safety and love" and Father's relationship with Child was not consistent. *Id.* at 28. Mother also testified that "forcing [Child] to have contact with [Father] for all of these years has not served her well" and explained that Child has "very bad stress and anxiety issues" that has required counseling. *Id.* at 33.

Mother testified that Child and Stepfather "have a good relationship." *Id.* at 25. Mother further explained that Stepfather "showed [Child] that she should have her feelings respected and that she could count on him to always be there for her, and they developed a really good bond." *Id.* Mother described Child and Stepfather's relationship as "a typical parent-child relationship." *Id.* at 26.

Stepfather testified that he wished to adopt Child and stated that he treats her like his own daughter. *Id.* at 40. Stepfather further testified, "I love that little girl with all my heart[.]" *Id.* at 40-41. Stepfather explained that he did not believe that terminating Father's rights would be detrimental to Child because "there's no consistency" and "there is no real bond other than more of an uncle-type thing" between Child and Father. *Id.* at 41.

Father testified he was in the hospital in November 2022 for a mental breakdown for over a month, incarcerated in 2023 for approximately two months, and homeless since the end of June 2022. Father stated that he has a pending criminal case for Driving Under the Influence. Father explained that he just got approved for transitional housing. Father testified that he does not have his own vehicle and "that's the only reason why I stopped coming to see [Child]." *Id.* at 49.

Father testified that he called Mother in July 2022 to let her know he was homeless and sent Child a Christmas card in December 2022. Father further testified that he sent texts to Mother in February, March, and April 2023. Father testified that the last time he saw Child was in September 2023 at a family gathering and he asked for her cell phone number, but Child said she had to ask Mother first. He explained that he bought gifts for Child but gave them to his mother for her to deliver to Child. Father also stated that, at one point, his cell phone that stored Child's phone number broke. Father explained that when he got a new cell phone, he obtained Mother's number but did not request Child's phone number. Father testified that he did not

communicate with Child through her Facebook account because he did not agree that she should have an account.

Father stated that Child "absolutely" loves him and shows it every time they are together. *Id.* at 49. Father stated, "I could have done better clearly, but I wish I could say I did the best. So I guess I didn't do the best, to be honest with you, or we wouldn't be here today." *Id.* at 50. Finally, Father testified, "I'm always going to be in Child's life. I just need to bounce back from this temporary hardship that I'm currently in." *Id.*

Dr. Menta testified as an expert in clinical psychology. Dr. Menta observed Child, Mother, Stepfather, and Father to complete a bonding assessment. Dr. Menta testified that Child expressed closeness to Mother and Stepfather and an openness to adoption. Dr. Menta explained that Child expressed being uncomfortable around Father, fearful of his unpredictable behavior to the point of getting physically ill and had anxiety about upsetting Father. Dr. Menta testified that Child had a positive relationship and a "secure bond" with Mother and Stepfather. N.T. Hearing, 1/29/24, at 14. Dr. Menta continued:

> that [bond] is contrasted by the disorganized attachment with [F]ather, and ultimately it would be in [Child's] best interest to go ahead and sever that attachment with [F]ather so that she can continue to enjoy that secure attachment with [M]other and [S]tepfather, and ultimately that would help her have healthier relationships and healthier self-esteem moving forward.

*Id.* Dr. Menta explained that the disorganized attachment and anxiety that Child experiences is not due to a lack of time or contact with Father, but rather due to the neglect or trauma Child has suffered because of Father's significant mental health concerns and resulting unpredictable behavior. In her report, Dr. Menta concluded that Father "minimized his mental health issues and refuses to treat his mental health conditions" and "appears to still be struggling with psychosis and lacks insight." Bonding Assessment, 11/20/23, at 9.

At the conclusion of the hearings, the trial court terminated Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

On May 3, 2024, Attorney Lovelace filed an *Anders* brief without the benefit of relevant hearing transcripts, which prompted this Court to issue an order directing the court reporter to transcribe the relevant transcripts, the trial court to provide a supplemental Rule 1925(a) opinion, and the prothonotary to adjust the briefing schedule. On December 12, 2024, with the benefit of relevant transcripts, Attorney Lovelace once again filed an *Anders* brief indicating that, upon review, Father's appeal is wholly frivolous. Father failed to respond.

In the *Anders* brief, counsel indicated that Father wished to raise the following issue for our review: "Did the trial court err when it terminated the parental rights of [Father] pursuant to the Adoption Act and specifically 23 Pa.C.S. Section 2511?" *Anders* Br. at 6 (some capitalization omitted).

- 6 -

As a preliminary matter, we address appellate counsel's request to withdraw as counsel. "When presented with an *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." *Commonwealth v. Daniels*, 999 A.2d 590, 593 (Pa. Super. 2010). In order for counsel to withdraw from an appeal pursuant to *Anders*, our Supreme Court has determined that counsel must meet the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009).

Counsel has complied with the mandated procedure for withdrawing as counsel. Additionally, counsel confirms that counsel sent Father a copy of the *Anders* brief and petition to withdraw, as well as a letter explaining to Father that he has the right to retain new counsel, proceed *pro se*, and to raise any additional points. *See Commonwealth v. Millisock*, 873 A.2d 748, 751 (Pa. Super. 2005) (describing notice requirements).

Because counsel has satisfied the above requirements, we will address the substantive issue raised in the *Anders* brief. Subsequently, we must

"make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." *Santiago*, 978 A.2d at 355 n.5 (citation omitted); *see also Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*) (noting *Anders* requires the reviewing court to "review 'the case' as presented in the entire record with consideration first of issues raised by counsel").

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the

evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b):

determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

Here, we concentrate our analysis on subsection 2511(a)(1). Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *K.Z.S.*, 946 A.2d at 758. "Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition [and] the most critical period for evaluation is the six months immediately preceding the filing of the termination petition." *L.A.K.*, 265 A.3d at 592.

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*Id.* (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." *Id.* (citations and internal quotation marks omitted). "To that end, even where the evidence clearly establishes [that] a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citations and internal quotation marks omitted).

Instantly, the trial court found that, despite having defined periods of custody, "Father has little to no involvement in [C]hild's life." Sup. Trial Ct. Op., 11/21/24, at 6. The court observed that Father failed to initiate visits

with Child in the six months preceding the filing of the termination petition. *Id.* The Court acknowledged that Father sent a few letters and text messages to Child through Mother but credited Mother's testimony that the messages did not include requests to see or communicate with Child. *Id.* The court found that Father failed to utilize reasonable firmness in maintaining contact with Child when he: failed to request Child's cell phone number from Mother so that he could contact her, failed to utilize alternative means of communication with Child, *i.e.*, Facebook, and failed to request transportation assistance from his family or Mother so that he could attend his defined periods of custody. *Id.* The court opined:

> [] Father did not contact [] Child directly, despite having no barriers by the [] Child or [] Mother. [] Father took no initiative to see [] Child other than through specific requests by the Paternal Grandmother. While the [c]ourt does not doubt that [] Father loves [] Child, [] Father took no reasonable efforts to overcome any barriers in order to see or communicate with [] Child. [] Father has not exercised any parental duties in several years. The [c]ourt finds by clear and convincing evidence that Father's conduct warrants termination.

*Id.* at 7. Our review of the record supports the trial court's findings, and we decline to reweigh the evidence or usurp the court's credibility determinations. Accordingly, we discern no abuse of discretion.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." ***In re Adoption of***

- 12 -

***J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond" that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." ***In re Adoption of N.N.H.***, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). "The mere existence of an emotional bond does not preclude the termination of parental rights." ***In re A.D.***, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that terminating the bond "would destroy an existing, necessary, and beneficial relationship." ***Id.*** at 898 (citation omitted). Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010).

The court credited Dr. Menta's testimony that Child has a "disorganized attachment" with Father and "would benefit from that bond being severed." Sup. Trial Ct. Op. at 9. The court recognized that "some sort of bond may still exist between" Father and Child but found that "the bond is unhealthy" and,

- 13 -

if continued, would negatively affect Child's development and future relationships. *Id.* at 9. The court opined, "Father's unpredictable behavior and absence has left [] Child anxious and fearful of [] Father." *Id.* at 10.

The court credited the testimony from Mother, Stepfather, and Dr. Menta that Child is extremely close to Mother and Stepfather, who consistently provide for Child's physical and emotional needs, and that Child wishes to be adopted. *Id.* at 10. The court opined: "Stepfather provides support for [] Child, not only financially, but also other intangibles which include but are not limited to love, comfort, education, security, and stability." *Id.* The court found by clear and convincing evidence that the termination of Father's parental rights was in Child's best interest.

The record supports the trial court's findings. The court heard testimony that Child has a secure bond with Mother and Stepfather and, in contrast, an unhealthy "disorganized attachment" to Father, and that it would not be detrimental to Child if Father's parental rights were terminated. As the record supports the trial court's findings, we discern no abuse of discretion.

In summation, following our review of the issues raised in counsel's *Anders* brief, we agree with counsel that the trial court did not abuse its discretion in terminating Father's parental rights. In addition, our independent review of the proceedings reveals there are no issues of arguable merit to be raised on appeal. Accordingly, we grant counsel's petition to withdraw and affirm the order terminating Father's parental rights.

Order affirmed.  Petition to withdraw as counsel granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  3/12/2025